CORRECTED: September 27, 2018
RENDERED: SEPTEMBER 27, 2018
TO BE PUBLISHED

𝕾upreme 𝕮ourt of 𝕶entucky FINAL

DATE 2/14/19 _Kim Redmon, DC_

2016-SC-000529-DG

COMMONWEALTH OF KENTUCKY,                                APPELLANT
CABINET FOR HEALTH AND FAMILY
SERVICES, DEPARTMENT FOR MEDICAID
SERVICES

                    ON REVIEW FROM COURT OF APPEALS
V.                      CASE NO. 2015-CA-000246
              HARLAN CIRCUIT COURT NO. 14-CI-00542

LETTIE SEXTON, BY AND THROUGH HER                        APPELLEES
AUTHORIZED REPRESENTATIVE,
APPALACHIAN REGIONAL HEALTHCARE,
INC.; AND COVENTRY HEALTH AND LIFE
INSURANCE D/B/A COVENTRYCARES,
INC.

AND

                    2016-SC-000534-DG

COVENTRY HEALTH AND LIFE                                 APPELLANT
INSURANCE D/B/A COVENTRYCARES,
INC.

                    ON REVIEW FROM COURT OF APPEALS
V.                      CASE NO. 2015-CA-000246
              HARLAN CIRCUIT COURT NO. 14-CI-00542

LETTIE SEXTON, BY AND THROUGH HER                        APPELLEES
AUTHORIZED REPRESENTATIVE,
APPALACHIAN REGIONAL HEALTHCARE,
INC., AND COMMONWEALTH OF
KENTUCKY, CABINET FOR HEALTH AND
FAMILY SERVICES

AND

LETTIE SEXTON, BY AND THROUGH HER                          APPELLANT
AUTHORIZED REPRESENTATIVE,
APPALACHIAN REGIONAL HEALTHCARE,
INC.

                    ON REVIEW FROM COURT OF APPEALS
V.                        CASE NO. 2015-CA-000246
                  HARLAN CIRCUIT COURT NO. 14-CI-00542

COMMONWEALTH OF KENTUCKY,                                  APPELLEES
CABINET FOR HEALTH AND FAMILY
SERVICES AND COVENTRY HEALTH AND
LIFE INSURANCE D/B/A
COVENTRYCARES, INC.

AND

                        2017-SC-000095-DG

COVENTRY HEALTH AND LIFE                                   APPELLANT
INSURANCE

                    ON REVIEW FROM COURT OF APPEALS
V.                        CASE NO. 2015-CA-000246
                  HARLAN CIRCUIT COURT NO. 14-CI-00542

LETTIE SEXTON, BY AND THROUGH HER                         APPELLEES
AUTHORIZED REPRESENTATIVE,
APPALACHIAN REGIONAL HEALTHCARE,
INC., AND COMMONWEALTH OF
KENTUCKY, CABINET FOR HEALTH AND
FAMILY SERVICES

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**REVERSING, VACATING, AND REMANDING**

This case requires us to consider whether the courts of Kentucky can

undertake a statutorily created judicial review of an administrative agency's

final order when the person appealing that final order does not have a concrete

injury. Our resolution requires us to apply the doctrine of constitutional

2

standing, and, in doing so, we hold as a matter of first impression that the existence of a plaintiff's standing is a constitutional requirement to prosecute any action in the courts of this Commonwealth, adopting the United States Supreme Court's test for standing as espoused in *Lujan v. Defenders of Wildlife*.[1] Because this case reaches us via an interlocutory appeal from the circuit court's review of an agency ruling, we further hold that all of Kentucky's courts have the responsibility to ascertain, upon the court's own motion if the issue is not raised by a party opponent, whether a plaintiff has constitutional standing, an issue not waivable, to pursue the case in court. Under that test, we conclude that Medicaid beneficiary Lettie Sexton, the putative petitioner in the present case, does not have the requisite constitutional standing to pursue her case in the courts of the Commonwealth. So, we reverse the decision of the Court of Appeals, vacate the ruling of the circuit court, and remand this case to the circuit court with instructions to dismiss the case.

## I. BACKGROUND.

Lettie Sexton, a Medicaid beneficiary, was admitted to Appalachian Regional Healthcare ("ARH"), complaining of chest pain. ARH sent a request for preauthorization of medical services to Coventry Health and Life Insurance, d/b/a Coventry Cares, Inc. ("Coventry"), a managed-care organization that had contracted with the Kentucky Cabinet for Health and Human Services ("Cabinet") to provide reimbursement to hospitals for certain services provided to Medicaid beneficiaries. Coventry approved a 23-hour observation stay at ARH. Sexton, through ARH, her designated representative for any disputed

---

[1] 504 U.S. 555, 560–561 (1992).

claims, requested that the observation stay at ARH be extended 15 more hours for a cardiology consultation. Coventry denied reimbursement for this request. Sexton was eventually hospitalized at ARH for approximately 38 hours.

ARH then requested an internal review by Coventry of its denial of reimbursement for the 15 hours of additional hospitalization. After review, Coventry upheld its denial. ARH, ostensibly acting for Sexton, then requested a Medicaid Fair Hearing to challenge Coventry's denial. A hearing officer for the administrative-services branch of the Cabinet conducted that hearing and ruled that Sexton lacked standing to pursue an appeal of Coventry's denial of reimbursement to ARH because Sexton herself had no stake in the outcome of the dispute between ARH and Coventry. The hearing officer's ruling was based upon the fact that because Medicaid had paid ARH for the services rendered to Sexton, she would owe nothing at all to ARH for the extended hospital stay.[2] In due course, the Cabinet Secretary adopted the hearing officer's recommendation as the Cabinet's final order.

ARH, acting as Sexton's representative, then sought judicial review under Kentucky Revised Statute (KRS) 13B.140 of the Cabinet's final order by timely filing a petition for review in the Harlan Circuit Court. The Cabinet filed a motion to dismiss the petition, alleging that: (1) Sexton lacked standing; (2) ARH was not Sexton's authorized representative; (3) venue did not lie in Harlan County; and (4) that the petition was barred by the doctrine of sovereign

---

[2] This argument is a reoccurring one used by several managed-care organizations that has resulted in numerous pending cases in the Court of Appeals.

immunity because it did not strictly comply with the requirements of KRS 13B.140. Coventry joined in the Cabinet's motion on the same grounds.

Following a hearing, the circuit court denied the motion to dismiss. On the issue of standing, the circuit court found that the individual ARH employees who had been authorized by Sexton to represent her interests were sufficiently identified in the exhibits to the petition to provide standing and to comply substantially with the requirements of KRS 13B.140. As for venue and subject-matter jurisdiction, the circuit court ruled that the addresses for Sexton's designated representatives were the address of the ARH hospital employees located in Harlan County, thus fixing venue there in accordance with KRS 13B.140. On the issue of sovereign immunity, the circuit court determined that this argument was based upon the proposition that a failure strictly to comply with KRS 13B.140 eliminated waiver of sovereign immunity. But since the circuit court found the petition to be otherwise sufficient, the limited waiver of immunity was not eliminated. So, the circuit court denied Coventry's and the Cabinet's motions to dismiss the petition.

Because the circuit court denied the Cabinet and Coventry's sovereign-immunity argument, they each filed an interlocutory appeal in the Court of Appeals. ARH initially sought a dismissal of the appeal, claiming that the circuit court's order was not final and appealable.

On ARH's motion to dismiss the appeal, the Court of Appeals found that the circuit court's rulings on sovereign immunity were immediately appealable, and therefore denied ARH's motion to dismiss the appeal. The Court of Appeals also found that there was no requirement that KRS 13B.140 be strictly followed for the waiver of sovereign immunity to apply. But the Court of Appeals also

5

found that in Medicaid reimbursement cases like this one, sovereign immunity has been waived by the overwhelming implication of statutory language, including KRS 45A.235.[3] Additionally, the Court of Appeals found that the statutes governing the state Medicaid program, KRS 205.510–645, indicate that sovereign immunity had been waived.

Finally, the Court of Appeals found that venue, as provided in the Kentucky Model Procurement Code, specifically KRS 45A.245, mandated that an aggrieved person, firm, or corporation who has a valid written contract must bring an enforcement action in Franklin Circuit Court. Because the petition was filed in Harlan Circuit Court, the Court of Appeals held that the circuit court's ruling denying the motion to dismiss based on improper venue should be vacated and directed that the parties may make a motion to transfer the case to Franklin Circuit Court or file a new petition for review in Franklin Circuit Court.

Both parties then filed discretionary-review petitions, which we granted.

## II. ANALYSIS.

### A. Reviewability of the Issues.

From the outset of our analysis, it is important to note that this case is before us at this juncture as an *interlocutory* appeal because of the lower courts' rulings on the sovereign immunity issue. And we recently held in *Baker v. Fields* "that the scope of appellate review of an interlocutory appeal of the trial court's determination of the application of qualified official immunity is limited to the specific issue of whether the immunity was properly denied and

---

[3] All parties now agree that the Court of Appeals erred by applying KRS 45A.235 to this case.

nothing more."[4] Although the case before us today involves a circuit court's ruling on an issue of sovereign-immunity, not qualified official immunity, the principle is the same—the scope of appellate review of an interlocutory appeal of the trial court's determination of the application of sovereign immunity is limited to that issue and nothing more.

Such a rule grounds itself in this Court's analysis of issues that can and cannot be decided via interlocutory appeal in *Breathitt County Bd. of Educ. v. Prater*.[5] At the risk of simply restating our analysis in that case and in *Baker v. Fields*, we simply note that interlocutory appeals are a vehicle to be used rarely, only to decide a few, enumerated issues.

Admittedly, the question of whether the issue of standing can be reached on an interlocutory appeal has never been before this Court. But a nationwide review of relevant case law reveals a trend that parties, themselves, may not raise the issue of standing by interlocutory appeal.[6] Most consistently, federal appellate courts hold "that a district court's denial of a motion to dismiss on justiciability grounds is *not* immediately appealable under the collateral-order

---

[4] 543 S.W.3d 575, 578 (Ky. 2018).

[5] 292 S.W.3d 883 (Ky. 2009).

[6] *See, e.g., Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1334–35 (11th Cir. 1999) (holding that a party may not take an immediate appeal of a trial court's decision regarding standing because appealing such issue fails the collateral order doctrine); *compare SCI Texas Funeral Servs, Inc. v. Hijar*, 214 S.W.3d 148, 153 (Tx. App. 2007) (holding that a party may take an immediate appeal of a trial court's decision regarding standing for the purposes of class certification).

7

doctrine."[7] "Under the 'collateral order doctrine,' also called the *'Cohen*[8] doctrine,' a limited set of district court orders are reviewable though short of final judgment."[9] And in *Breathitt County*, we aligned Kentucky's stance on interlocutory appeals with that of federal law's collateral-order doctrine.[10]

The rare use of interlocutory appeals in Kentucky, the absence of legal precedent in Kentucky allowing an interlocutory appeal of a trial court's ruling on the issue of standing, the uniform federal legal precedent prohibiting an interlocutory appeal on the issue of standing, this Court's "compelling interest in maintaining an orderly appellate process,"[11] and the general rule that a nonfinal order cannot be immediately appealed, all converge to satisfy us of the value of a rule that prohibits an interlocutory appeal of a trial court's decision regarding the plaintiff's standing to sue.

Therefore, we hold that a trial court's ruling on the issue of constitutional standing, in and of itself, does not give rise to an immediate right to an appeal, i.e. an interlocutory appeal. But such prohibition against interlocutory appeal on solely the issue of standing should not constrain the power of the appellate court, at the instance of a party-opponent or acting upon on its own motion, from inquiring into whether a plaintiff has the requisite standing to sue when

---

[7] *Pryor*, 180 F.3d at 1334 (11th Cir. 1999); *see Crymes v. DeKalb County*, 923 F.2d 1482, 1484–85 (11th Cir. 1991) (holding the same in the specific context of ripeness); *see also Children's Healthcare Is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1418 (6th Cir. 1996); *Triad Assocs., Inc. v. Robinson*, 10 F.3d 492, 496–97 n.2 (7th Cir. 1993); *Shanks v. City of Dallas*, 752 F.2d 1092, 1099 n. 9 (5th Cir. 1985); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 474–75 (2d Cir. 1974).

[8] *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949).

[9] 36 C.J.S. *Federal Courts* § 432.

[10] *Breathitt County*, 292 S.W.3d at 886–87.

[11] *Ready v. Jamison*, 705 S.W.2d 479, 482 (Ky. 1986).

an interlocutory appeal is properly before an appellate court on an issue recognized as immediately appealable.

In *Harrison v. Leach*, we held that an appellate court errs when it raises the issue of standing on its own motion because standing is a waivable defense.[12] But *Harrison* crafted this rule while analyzing the issue of *statutory,* not *constitutional,* standing.[13] To clarify the differences among the standing concepts, we find helpful this explanation offered by the U.S. Court of Appeals for the Third Circuit:

> Though all are termed "standing," the differences between statutory, constitutional, and prudential standing are important. Constitutional and prudential standing are about, respectively, the constitutional power of a . . . court to resolve a dispute and the wisdom of so doing. Statutory standing is simply statutory interpretation: the question it asks is whether [the legislature] has accorded *this* injured plaintiff the right to sue the defendant to redress his injury.[14]

Put differently, "The question whether a plaintiff can sue for violations of [a statute] is a matter of statutory standing, 'which is perhaps best understood as not even standing at all.' . . . Dismissal for lack of statutory standing is properly viewed as dismissal . . . for failure to state a claim [upon which relief may be granted]."[15]

In this case, by contrast, constitutional standing is at issue because Coventry and the Cabinet are not alleging that the federal or state Medicaid

---

[12] 323 S.W.3d 702, 703 (Ky. 2010).

[13] This Court in *Lawson v. Office of Atty. Gen.* recognized this to be the case. 415 S.W.3d 59, 67 (Ky. 2013).

[14] *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 295 (3d Cir. 2007).

[15] 13A Fed. Prac. & Proc. Juris. § 353 (3d ed.) (quoting *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 51–53 (4th Cir. 2011)).

statutes and regulations do not afford Sexton relief, i.e. that these laws make no provision for Sexton to bring suit; rather, Coventry and the Cabinet are alleging that Kentucky courts cannot hear this case because no *justiciable cause*—a *constitutional predicate to maintaining a case in Kentucky courts*—exists. We hold that all Kentucky courts have the constitutional duty to ascertain the issue of constitutional standing, acting on their own motion, to ensure that only *justiciable causes* proceed in court, because the issue of constitutional standing is not waivable.[16] Our holding conforms to the general understanding of constitutional standing as a predicate for a court to hear a case and the ability of a court, acting on its own motion, to address that issue.[17]

In this case, the procedurally proper interlocutory-appeal issue before this Court is whether the doctrine of sovereign immunity bars Sexton from suit. Our holding today is not an affirmation that sovereign immunity exists in this

---

[16] "Because [constitutional] standing to sue is an essential aspect of . . . courts' . . . jurisdiction, it cannot be waived. It may be challenged for the first time at any time during the pendency of the proceedings and, if none of the parties raises it, the . . . courts (both trial and appellate) may, and indeed have a duty to, raise the issue sua sponte if there is any doubt about it." Joan Steinman, *Shining a Light in a Dim Corner: Standing to Appeal and the Right to Defend a Judgment in the Federal Courts*, 38 Ga. L. Rev. 813 (2004) (citing *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 488 n.4 (1980) (Rehnquist, J., dissenting); *Juidice v. Vail*, 430 U.S. 327, 331 (1977)).

[17] *See Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001) ("We are obliged to examine standing *sua sponte* where standing has erroneously been assumed below."); *see also, e.g., Community First Bank v. National Credit Union Admin.*, 41 F.3d 1050, 1053 (6th Cir. 1994) ("Standing is not an affirmative defense that must be raised at risk of forfeiture. Instead, it is a qualifying hurdle that plaintiffs must satisfy even if raised *sua sponte* by the court."); *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 983 (6th Cir. 2012) ("The issue of standing, however, may be raised *sua sponte*."). Judge Batchelder of the Sixth Circuit wrote an extremely persuasive concurring opinion in *Children's Healthcare is a Legal Duty, Inc. v. Deters* explaining why a court should raise the issue of standing sua sponte on an interlocutory appeal. 92 F.3d 1412, 1418-20 (6th Cir. 1996).

case to bar Sexton from suit—we do not reach the merits of that argument because Sexton lacks the constitutional standing necessary for us to reach any of the other potential issues in this case. A party need not be correct on the merits of its interlocutory appeal issue for an appellate court to raise the issue of constitutional standing. But a party must have a facially valid and procedurally proper interlocutory appeal for an appellate court to reach the issue of standing.[18] Because we have determined that this case is properly before this Court on interlocutory appeal, we now turn to the constitutional standing issue in this case.

## B. The principle of constitutional standing in Kentucky.

An elementary principle of the federal and state governmental structure is the division of power among three branches of government: the legislature, the executive, and the judiciary.[19] The United States Supreme Court has interpreted the United States Constitution as providing a "series of limits on the federal judicial power."[20] Identified as the "justiciability doctrines," these limits on the federal judicial power derive from Article III, Section 2, Clause 1 of the U.S. Constitution, which states, "The judicial Power shall extend to all

---

[18] For example, a private bakery, acting as the sole defendant, who may have a legitimate argument that the plaintiff does not possess the requisite standing to bring suit, would not be able to file a facially valid and procedurally proper interlocutory appeal on the basis of sovereign immunity, and the appellate court hearing the case would not be able to reach the issue of standing.

[19] *See* Ky. Const. § 27 ("The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which judicial, to another."); Ky. Const. § 28 ("No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.").

[20] Erwin Chemerinsky, *Constitutional Law*, 40 (Vicki Been et al. eds., 5th ed. 2013).

11

*Cases . . .* [and] *Controversies . . ."*[21] A federal court cannot adjudicate a case that does not meet the requirements of the justiciability doctrines.

The U.S. Supreme Court has identified five major justiciability doctrines: (1) the prohibition against advisory opinions, (2) standing, (3) ripeness, (4) mootness, and (5) the political-question doctrine.[22] The Court has also distinguished between justiciability requirements that are "constitutional," meaning that Congress by statute cannot override them, and "prudential," meaning that they are based on prudent judicial administration and can be overridden by Congress since they are not constitutional requirements.[23] Of most concern in this case is the standing requirement and the constitutional limitations, if any, the standing requirement imposes.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[24] Federal constitutional standing has three requirements: the plaintiff must allege that 1) he or she has suffered or imminently will suffer an injury; 2) the injury is fairly traceable to the defendant's conduct; and 3) a favorable federal court decision is likely to redress the injury.[25] In addition to these federal constitutional requirements, two major federal prudential standing principles exist: (1) a party generally may assert only his or her own rights and cannot raise the claims of third parties not before the court, i.e. the prohibition against

---

[21] (emphasis added).

[22] Chemerinsky, at 40.

[23] *Id.*

[24] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[25] Chemerinsky, at 45.

"third-party standing"; and (2) a plaintiff may not sue as a taxpayer who shares a grievance in common with all other taxpayers, i.e. the prohibition against "generalized grievances."[26]

To be clear, these standing requirements as outlined above are discussed in the context of application to the limit on *federal* judicial power, not *state* judicial power. Under principles of federalism, "[l]ong-established precedent holds that Article III standing requirements do not apply in state courts and courts of the territories."[27] So we now examine Kentucky's current standing doctrine.

A recently published law journal article[28] aptly summarizes Kentucky's standing doctrine:

> In Kentucky, standing is not a constitutional doctrine, but appears to be a self-imposed restraint based on a prohibition against generalized grievances as a "fundamental" principle of adjudication. Kentucky courts have offered limited explanation of their standing doctrine. The source of the doctrine appears to be a 1957 case challenging an alcohol board's decision to increase the number of licenses available.[29] There, [Kentucky's highest Court] held that "[i]t is fundamental that a person may attack a proceeding of this nature by independent suit only if he can show that his legal rights have been violated."[30] This was based on the principle that "[a] public wrong or neglect or breach of a public duty cannot be redressed in a suit in the name of an individual whose interest in the right asserted does not differ from that of the

---

[26] *Id.*

[27] John W. Curran, *Who's Standing in the District After Grayson v. AT&T Corp.? The Applicability of the Case-or-Controversy Requirement in D.C. Courts*, 62 Am. U. L. Rev. 739, 740 (2012) (citing *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 8 n.2 (1988) ("[T]he special limitations that Article III of the Constitution imposes on the jurisdiction of the federal courts are not binding on the state courts.")).

[28] Wyatt Sassman, *A Survey of Constitutional Standing in State Courts*, 8 Ky. J. Equine, Agric. & Nat. Resources L. 349, 369–70 (2016).

[29] *Lexington Retail Beverage Dealers Ass'n v. Dep't of Alcoholic Beverage Control Bd.*, 303 S.W.2d 268, 269–70 (Ky. 1957).

[30] *Id.*

13

public generally, or who suffers injury only in common with the general public."[31]

> Under the modern Kentucky test, "[t]o have standing to sue, one must have a judicially cognizable interest in the subject matter of the suit" that is not "remote and speculative," but "a present and substantial interest in the subject matter."[32] Kentucky courts have not adopted the *Lujan* test, but have adopted elements of federal decisions on associational standing, which have seen substantially more elaboration than general standing doctrine in the Kentucky courts.[33]

Kentucky courts have seemingly created a judicially—as opposed to constitutionally—imposed standing requirement. At the federal level, where standing is partly grounded in Article III, Section 2, Clause 1 of the U.S. Constitution, while "[the legislature] may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute,"[34] "[i]t is, of course, true that '[the legislature] may not confer jurisdiction on . . . courts to render advisory opinions[.]'"[35] Federal law's constitutional standing requirement is a safeguard against the overreach of judicial, legislative, and executive power. To ascertain what, if any, constitutional standing requirements exist in Kentucky, we turn to the Kentucky Constitution first and foremost.

---

[31] *Id.* (citing *Wegener v. Wehrman*, 227 S.W.2d 997, 998 (Ky. 1950)).

[32] *Bailey v. Pres. Rural Roads of Madison Cnty., Inc.*, 394 S.W.3d 350, 355 (Ky. 2011).

[33] *See Bailey*, 394 S.W.3d at 356; *see also Interactive Gaming*, 425 S.W.3d at 112–15. Kentucky does recognize taxpayer standing in specific circumstances. *See Price v. Commonwealth, Transp. Cabinet*, 945 S.W.2d 429, 432–33 (Ky. App. 1996) (citing *Rosembalm v. Commercial Bank*, 838 S.W.2d 423 (Ky. App. 1992) (collecting cases where "Kentucky has consistently recognized taxpayer standing")).

[34] *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973) (citing *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212 (1972) (White, J., concurring); *Hardin v. Kentucky Utilities Co*, 390 U.S. 1, 6 (1968)).

[35] *Linda R.S.*, 410 U.S. at 617 n.3 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972)).

Section 109 of the Kentucky Constitution states, "The judicial power of the Commonwealth shall be vested exclusively in one Court of Justice which shall be divided into a Supreme Court, a Court of Appeals, a trial court of general jurisdiction known as the Circuit Court and a trial court of limited jurisdiction known as the District Court." The Kentucky Constitution then goes on to outline the various levels of courts in Kentucky and their respective powers.

Most importantly, "The *Circuit Court* shall have *original jurisdiction* of all *justiciable causes* not vested in some other court. It shall have such appellate jurisdiction as may be provided by law."[36] "The *Court of Appeals* shall have *appellate jurisdiction only* . . ." except in certain situations not relevant in this case.[37] "The *Supreme Court* shall have *appellate jurisdiction only* . . ." except in certain situations not relevant to this case.[38] "The *district court* shall be a court of *limited jurisdiction* and shall exercise original jurisdiction as may be provided by the General Assembly."[39]

Notably, § 109 of the Kentucky Constitution, describing the judicial power in Kentucky, does not contain the same *case or controversy* language contained in Article III, Section 2, Clause 1 of the U.S. Constitution, nor does any other provision of the Kentucky Constitution discussing judicial power in the various levels of courts. This *case or controversy* language in the U.S. Constitution is the lynchpin for all justiciability doctrines, including standing.

---

[36] Ky. Const. § 112(5) (emphasis added).

[37] Ky. Const. § 111(2) (emphasis added).

[38] Ky. Const. § 110(2)(a) (emphasis added).

[39] Ky. Const. § 113(6) (emphasis added).

Most notably, however, § 112(5) of the Kentucky Constitution grants circuit courts original jurisdiction over all *justiciable causes* not vested in some other court.

The standing doctrine is said to have its origins in the U.S. Supreme Court case of *Fairchild v. Hughes*, a decision written by Justice Brandeis and rendered in 1922.[40] The U.S. Supreme Court later expounded on the doctrine: If a party does not have the requisite standing to bring suit, the case is said to be *nonjusticiable*; if a party does have the requisite standing to bring suit, the case is said to be *justiciable*.[41] The first appearance of the *justiciable causes* phrase in § 112(5) appears in the 1974 Amendments to the Kentucky Constitution. By limiting the circuit court's jurisdiction to adjudicating *justiciable causes* only, § 112(5) appears to have adopted some notion of the *justiciability doctrines* articulated by the U.S. Supreme Court.

We have recognized the *justiciable causes* phrase as a constitutional limitation on Kentucky courts' judicial power before; "'Standing,' of course, in its most basic sense, refers to an integral component of the *'justiciable cause'* requirement [in Ky. Const. § 112(5)] underlying the trial court's jurisdiction."[42] *Lawson* also provided a potential constitutional test for Kentucky courts to examine standing: "To invoke the court's jurisdiction, the plaintiff must allege

---

[40] 258 U.S. 126 (1922).

[41] *See Flast v. Cohen*, 392 U.S. 83, 95 (1968) ("[N]o *justiciable* controversy is presented when . . . there is no standing to maintain the action.") (emphasis added) (citing *Tileston v. Ullman*, 318 U.S. 44 (1943); *Frothingham v. Mellon*, 262 U.S. 447 (1923)); *Steel Co. v. Citizens for a Better Envt*, 523 U.S. 83, 102 (1998) ("Standing to sue is part of the common understanding of what it takes to make a *justiciable* case.") (emphasis added).

[42] *Lawson v. Office of Atty. Gen.*, 415 S.W.3d 59, 67 (Ky. 2013) (citing Ky. Const. § 112) (emphasis added); *Rose v. Council for Better Education*, 790 S.W.2d 186 (Ky. 1989)).

[1] an *injury* [2] *caused* by the defendant [3] of a sort the court is able to *redress*."[43] The emphasized words in the sentence quoted from *Lawson*—injury, causation, and redressability—are the three constitutional standing requirements as outlined by the U.S. Supreme Court in *Lujan.*[44] To provide clarity to Kentucky's standing doctrine, we formally adopt the *Lujan* test as the constitutional standing doctrine in Kentucky as a predicate for bringing suit in Kentucky's courts.

So, at bottom, for a party to sue in Kentucky, the initiating party must have the requisite constitutional standing to do so, defined by three requirements: (1) injury, (2) causation, and (3) redressability. In other words, "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."[45] "[A] litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent . . .."[46] "The injury must be . . . 'distinct and palpable,' and not 'abstract' or 'conjectural' or 'hypothetical.'"[47] "The injury must be 'fairly' traceable to the challenged action, and relief from the injury must be 'likely' to follow from a favorable decision."[48]

While the *justiciable causes* language only appears in § 112(5), which specifically and only enumerates Kentucky circuit-court jurisdiction, the

---

[43] *Lawson*, 415 S.W.3d at 67 (emphasis added) (citing Ky. Const. § 112; *Rose*, 790 S.W.2d at 186).

[44] 504 U.S. at 560–61.

[45] *Allen v. Wright*, 468 U.S. 737, 751 (1984) (overruled by *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) on other grounds).

[46] *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (citing *Lujan*, 504 U.S. at 578).

[47] *Allen*, 468 U.S. at 751.

[48] *Id.*

17

standing doctrine applies to cases brought before all Kentucky courts. Section 112(5) places *original jurisdiction* over a case in the circuit court; this means that all cases, not expressly designated by a rule of law to be heard by another court, must appear before the circuit court, the trial court of general jurisdiction. And recall that the circuit court "shall have original jurisdiction of all *justiciable causes.*" If a case is not *justiciable*, specifically because the plaintiff does not have the requisite standing to sue, then the circuit court *cannot* hear the case. And because both this Court and the Court of Appeals "shall have *appellate jurisdiction only,*" logically speaking, neither court can adjudicate a case on appeal that a circuit court cannot adjudicate because the exercise of appellate jurisdiction *necessarily assumes* that proper original jurisdiction has been established first at some point in the case.[49]

Therefore, if a circuit court cannot maintain proper original jurisdiction over a case to decide its merits because the case is *nonjusticiable* due to the plaintiff's failure to satisfy the constitutional standing requirement, the Court of Appeals and this Court are constitutionally precluded from exercising appellate jurisdiction over that case to decide its merits. This is so because the exercise of appellate jurisdiction to decide the merits of a case necessarily assumes that proper original jurisdiction in the circuit court first exists. Stated more simply, establishing the requisite ability to sue in circuit court is a necessary predicate for continuing that suit in appellate court. In this way, the *justiciable cause* requirement applies to cases at all levels of judicial relief.

---

[49] Black's Law Dictionary defines "Appellate Jurisdiction" as, "The power of a court to *review and revise a lower court's decision.*" (10th ed. 2014). In contrast, Black's Law Dictionary defines "Original Jurisdiction" as, "A court's power to hear and decide a matter *before any other court can review the matter.*"

Having outlined Kentucky's standing doctrine, we now turn to determining whether Lettie Sexton has the requisite standing to sue in this case.

## C. Sexton lacks standing to sue.

Simply stated, Sexton, by and through her authorized representative, ARH, lacks the requisite standing to sue in this case. We emphasize the crucial determinative fact—because Sexton, not ARH, is the true plaintiff in this case, we must examine the standing requirement through the lens of Sexton's, not ARH's, purported satisfaction.

Sexton has not and will not suffer an "injury" in this case. Under Medicaid statutes and regulations, and as conceded by both parties, Sexton is not financially interested in any way whatsoever in the outcome of this dispute, which, at its core, is over whether ARH can pursue a reimbursement claim from Coventry through the Medicaid administrative process at the Cabinet.[50] Additionally, Sexton has not alleged that she did not receive all the proper medical care she needed. Nor has she alleged that she will be precluded from receiving medical care in the future.

At oral argument, a suggestion was made that in some broad sense Sexton and other Medicaid beneficiaries may have been or might be potentially harmed if ARH decided to withhold future medical care from Sexton because of Coventry's refusal to reimburse ARH for such care, absent administrative oversight of that decision. But the fear of ARH denying future medical care, a "conjectural" and "hypothetical" injury, cannot establish the requisite injury

---

[50] *See* 42 C.F.R. § 447.15.

19

component to satisfy the standing doctrine. Additionally, "[plaintiffs] cannot manufacture standing merely . . . based on their fears of hypothetical future harm that is not certainly impending."[51]

Nor can Medicaid beneficiaries' purported interest in maintaining the integrity of the system satisfy the standing requirement. This is exactly the type of "abstract, conjectural, and hypothetical injury" that fails the injury-in-fact standing requirement: "[I]t would exceed [constitutional] limitations if, at the behest of [the legislature] and in the absence of any showing of concrete injury, we were to entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws. . . . The party bringing suit must show that the action injures him in a concrete and personal way."[52]

Additionally, it has been argued that federal and state Medicaid statutes and regulations themselves create standing for Sexton to sue in court because they mandate a Medicaid State Fair Hearing be conducted to ascertain misconduct on the part of Coventry and that no such hearing was conducted. But, "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create . . . standing. Only a 'person who has been accorded a procedural right

---

[51] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 416 (2013) ("We hold that respondents lack Article III standing because they cannot demonstrate that the future injury they purportedly fear is certainly impending . . ..") (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)).

[52] *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (quoting *Lujan*, 504 U.S. at 580–81 (Kennedy, J., concurring)) (emphasis in original).

20

to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy."[53]

If a court were to instruct the Cabinet to conduct an administrative hearing regarding Coventry's denial of reimbursement to ARH, nothing in Sexton's life would change. Regardless of the outcome of this administrative hearing, Sexton would be no better or worse off than before the hearing was conducted. Furthermore, "[i]t is settled that [the legislature] cannot erase [constitutional] standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."[54] The U.S Supreme Court has additionally instructed:

> [The legislature's] role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. [Constitutional] standing requires a concrete injury even in the context of a statutory violation. For that reason, [a plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.[55]

Sexton's lack of standing becomes clearer when one looks at the root of what is being sought in this case. ARH is using Sexton as the front to redress its own potential loss. Coventry denied reimbursement to ARH in this case—ARH seeks to recover that reimbursement in some way circuitous or at least

---

[53] *Summers,* 555 U.S. at 496 (quoting *Lujan,* 504 U.S. at 572 n.7) (emphasis in original).

[54] *Spokeo, Inc. v. Robins,* 136 S.Ct. 1540, 1547–48 (2016) (quoting *Raines v. Byrd,* 521 U.S. 811, 820 n.3 (1997)); *see also Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100 (1979) ("In no event . . . may Congress abrogate the Art. III minima.").

[55] *Spokeo,* 136 S.Ct. at 1549 (citing *Summers,* 555 U.S. at 496) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create [constitutional] standing.")).

21

establish some process to appeal from the decisions of managed-care organizations not to reimburse providers for patient care. These are the true injuries in this case, having nothing to do with Sexton.

We acknowledge two important points. First, the legislature has amended Kentucky's legislative Medicaid reimbursement scheme to provide ARH redress should this situation arise again.[56] Second, it appears ARH can seek, and has sought, redress of its reimbursement grievances against MCOs by filing its own lawsuit.[57]

Concern has been raised over the limited, if not completely absent, oversight over the decisions of managed-care organizations that fail to provide reimbursement to hospitals for coverage provided to Medicaid beneficiaries. Such a concern begs legislative, not judicial, redress.

Our decision today is not that the Cabinet correctly decided that Sexton did not have the requisite standing to seek redress through an administrative agency hearing; rather, it is that Sexton does not have the requisite standing to seek redress for this alleged injury in a Kentucky court. Whether a party has the requisite standing to seek redress through an administrative agency is an

---

[56] *See* KRS 205.646(2) (eff. Apr. 8, 2016); *see also* KAR 17:035E, 040E.

[57] In fact, ARH has sued Coventry elsewhere, in federal court, for, in part, essentially the true relief it seeks here—obtaining reimbursement, or the chance to obtain reimbursement, for the services it provides to patients. *See, e.g., Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.,* 214 F.Supp.3d 606 (E.D. Ky. 2016) (dismissing ARH's complaint); *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.,* 970 F.Supp.2d 687 (E.D. Ky. 2013) (notably, *holding that ARH itself has standing to sue Coventry*).

entirely different question than whether a party has the requisite standing to seek redress through a Kentucky court.[58]

If Sexton had the requisite standing to afford this Court the ability to hear her case on the merits, then we would analyze the issue of whether she had the requisite standing to have her case heard by the Cabinet, an administrative agency. But because Sexton does not have the requisite standing to sue, because the legislature does not have the power to confer constitutional standing where none exists, and because the standing issue summarily decides this case, we need not reach the sovereign immunity issue, nor any of the other issues raised in this case.

## III. CONCLUSION.

We hold that it is the constitutional responsibility of all Kentucky courts to consider, even upon their own motion, whether plaintiffs have the requisite standing, a constitutional predicate to a Kentucky court's adjudication of a case, to bring suit. We adopt the United States Supreme Court's test for standing as announced in *Lujan v. Defenders of Wildlife*.[59] Under that test, we hold that Sexton lacks the requisite standing to sue in this case. Therefore, we reverse the Court of Appeals, vacate the decision of the trial court, and remand this case to the trial court with instructions to dismiss Sexton's petition for judicial review.

---

[58] For a discussion of this distinction, *see* 13B Fed. Prac. & Proc. Juris. § 3531.13 (3d ed.). We leave the issue of standing in an administrative agency adjudication for another day.

[59] 504 U.S. at 560–561.

All sitting. Minton, C.J., Cunningham, Hughes, Keller, VanMeter and Venters, JJ., concur. Wright, J., dissents by separate opinion.

WRIGHT, J., DISSENTING: The majority opinion concludes that Lettie Sexton lacks standing to bring a cause of action in the courts and orders that the trial court's decision be vacated and the petition for judicial review dismissed. Constitutional standing has three requirements: (1) injury, (2) causation, and (3) redressability.

Sexton was denied treatment for a heart condition to which she claims she had a right under Medicaid. The denial of the right to coverage and danger to her life is an injury. Coventry Health and Life Insurance, Inc. (Coventry) denied Sexton's request for additional observation and testing which was a denial of her alleged right to treatment and increased danger to her life. Coventry's denial of Sexton's claim for medical treatment left her dependent upon the charity of strangers. The alleged injury is redressable by ordering Coventry to pay Sexton for the value of any treatment wrongfully denied.

The majority's position is that since Sexton was fortunate enough to receive charity to cover the treatment, this destroyed her standing to sue in the courts of the Commonwealth to address the alleged wrongful denial of her right to treatment. The fact that the danger to Sexton was so severe that the doctor and the hospital gave her the treatment when they knew it was extremely unlikely they would be paid does not alter the fact that she was denied treatment by Coventry (causation) for which she had an alleged right (injury). Therefore, I dissent from the determination that Sexton lacked standing to sue in the courts of the Commonwealth.

24

Medicaid prohibits a health care provider from collecting any payment for treatment beyond what is paid by Medicaid. The patient who has been denied a treatment has two options: (1) request a hearing on the denial or (2) pay for the treatment herself and then request a hearing on the denial. If a person has enough money to pay for the treatment, the second would be a possibility. If the person is poor and unable to pay for the treatment, her only option is to forgo the treatment and request a hearing on the denial. This is a reasonable option unless the condition is life-threatening. If Sexton was unable to pay and postponed the treatment until a hearing could be had, then the critical life-threatening period would pass before a hearing could be had on the issue. If she was still alive when the hearing came about, then the hospitalization and treatment would obviously be unnecessary. If she died before the hearing, the hospitalization and treatment would be unnecessary, and she would lack standing to sue in the courts of the Commonwealth. A person who is rich enough to pay for her treatment and then appeal would have the option of obtaining potentially life-saving treatment. The person who is too poor to pay for her treatment is discriminated against by a denial of her potentially life-saving treatment merely because she is too poor to pay for the treatment.

A third option occurred in Sexton's case: the doctors and hospital were strongly of the opinion that hospitalization and treatment for additional time were necessary. Their determination of need was so strong that they provided the treatment even when they were aware that it would foreclose them from being paid. This treatment by the doctors and hospital was provided after Coventry denied coverage for the treatment (injury and causation). After Coventry had caused the alleged injury of denying Sexton potentially life-saving

25

treatment, then the doctors and hospital treated her out of charity. The majority's position is that this act of charity destroyed Sexton's standing and ability to seek redress in the courts of the Commonwealth.

Unfortunately, Sexton lacked the ability to pay and when she received charity from the doctors and hospital the majority's opinion would deny her access to justice due to her financial condition of only being able to receive a potentially life-saving treatment as a result of charity. The majority effectively slams the courthouse doors in Sexton's face due to her economic condition—creating an access to justice issue for our most vulnerable population. As William Blackstone stated centuries ago, "it is a settled and invariable principle . . . that every right when withheld must have a remedy, and every injury its proper redress." *Commentaries on the Law of England*, note 42 at 109 (1765). Here, Sexton's right was withheld, and she sustained an injury. However, she is afforded neither remedy nor redress due to her socioeconomic status.

The majority opinion holds that Sexton lacks standing because: (1) she received the treatment the treating physician said she needed so the treatment is no longer needed; (2) the hospital and doctors are prohibited from suing a Medicaid patient for the services provided and cannot sue Sexton; and (3) since she received the treatment and is immune to suit for the cost of the treatment she lacks an injury to give her standing to sue in the courts of the Commonwealth.

If Sexton had enough money to have paid for her treatment she would have been able to have an administrative hearing and standing in the courts. Because Sexton was not rich enough to pay for her treatment and was dependent upon the charity of strangers, she was denied an administrative

26

hearing and is now being denied standing to have her case heard in the courts. The only difference between Sexton and a patient who is rich enough to pay for their treatment is that Sexton's treatment was paid for by the charity of others.

The problem with the majority's position is that the injury occurred when Sexton was denied coverage for treatment which allegedly should have been paid by her Medicaid coverage. The charity from the hospital and doctors occurred later in time and was not a factor in the denial of coverage. It is a dangerous precedent to say that the courts will not hear a party who has been injured if the party receives charity to give them what they are already entitled to.

If Sexton had been able to pay for her own treatment, then she could have requested a hearing and, if denied, sought redress in the courts of the Commonwealth. If Sexton's relatives had given her the money for the treatment, would she lack standing to sue in the courts of the Commonwealth of Kentucky? Since the money for the treatment would be a gift, Sexton's relatives would lack the ability to require her to repay it. Under the majority's position, if Sexton received the treatment and could not be legally required to repay her relatives, then she would not have an injury. Therefore, Coventry's denial of coverage would not be an injury and she would lack standing in the courts.

It is important to understand where the majority's position might lead us in the future. Suppose Sexton had purchased a car to travel to the hospital for dialysis treatment rather than being denied Medicaid, then a dispute arose over the purchase agreement and the car dealer refused to give her the car. If her neighbors were so concerned that they raised the money and gave Sexton a car

27

that was as good as or better than the one that she was purchasing, the car would be a gift, and the neighbors would lack the legal right to require her to repay the money or return the car. In the current case, Sexton claims she has a right to coverage under Medicaid. In this example, she would be claiming a right to possession of the car under her purchase agreement. Under the majority's position, Sexton would lack an injury and standing to sue the dealer for the car under her purchase agreement. Are we really going to say that a subsequent act of charity would deprive someone of the ability to go to court and establish their rights?

How remote does the act of charity have to be before we will allow the economically disadvantaged into the courts? The majority would deny Sexton's access to the courts if the charity was given by the doctors or hospital. A logical extension of the majority's position would deny her access to the courts if the money to pay for the treatment was given by her relatives. The majority's ruling would also deny her access to the courts due to charity from her friends and neighbors. The simple fact is that she is injured if Coventry denies her coverage without regard to whether she received charity from someone—or when that charity happens to occur.

Coventry caused Sexton's alleged injury by denying her treatment under her Medicaid coverage. The injury occurred prior to the doctors and hospital deciding (even though they were very unlikely to be paid) to give her the treatment. The fact that Sexton received the treatment does not change the fact that she was denied coverage to which she alleges she had a right. The injury occurred when she was denied coverage and the subsequent charity from the doctors and hospital does not change the fact that she was injured.

28

COUNSEL FOR COMMONWEALTH OF KENTUCKY, CABINET FOR HEALTH AND FAMILY SERVICES, DEPARTMENT FOR MEDICAID SERVICES APPELLANTS:

Catherine Elaine York
Cabinet for Health and Family Services


COUNSEL FOR LETTIE SEXTON, BY AND THROUGH HER AUTHORIZED REPRESENTATIVE, APPALACHIAN REGIONAL HEALTHCARE, INC.:

Virginia Hamilton Snell
Carole Douglas Christian
Amanda Warford Edge
Wyatt, Tarrant & Combs, LLP

COUNSEL FOR COVENTRY HEALTH AND LIFE INSURANCE D/B/A COVENTRYCARES, INC.:

Joyce Ann Merritt
Samantha Nance
Embry Merritt Shaffar Womack, PLLC

Miguel Estrada
Lucas C. Townsend
Gibson, Dunn & Crutcher LLP

# Supreme Court of Kentucky

## 2016-SC-000529-DG

COMMONWEALTH OF KENTUCKY,                                              APPELLANT
CABINET FOR HEALTH AND FAMILY
SERVICES, DEPARTMENT FOR MEDICAID
SERVICES

                    ON REVIEW FROM COURT OF APPEALS
V.                       CASE NO. 2015-CA-000246
               HARLAN CIRCUIT COURT NO. 14-CI-00542

LETTIE SEXTON, BY AND THROUGH HER                                     APPELLEES
AUTHORIZED REPRESENTATIVE,
APPALACHIAN REGIONAL HEALTHCARE,
INC.; AND COVENTRY HEALTH AND LIFE
INSURANCE D/B/A COVENTRYCARES,
INC.

AND

## 2016-SC-000534-DG

COVENTRY HEALTH AND LIFE                                              APPELLANT
INSURANCE D/B/A COVENTRYCARES,
INC.

                    ON REVIEW FROM COURT OF APPEALS
V.                       CASE NO. 2015-CA-000246
               HARLAN CIRCUIT COURT NO. 14-CI-00542

LETTIE SEXTON, BY AND THROUGH HER                                     APPELLEES
AUTHORIZED REPRESENTATIVE,
APPALACHIAN REGIONAL HEALTHCARE,
INC., AND COMMONWEALTH OF
KENTUCKY, CABINET FOR HEALTH AND
FAMILY SERVICES

AND

2016-SC-000540-DG

LETTIE SEXTON, BY AND THROUGH HER                    APPELLANT
AUTHORIZED REPRESENTATIVE,
APPALACHIAN REGIONAL HEALTHCARE,
INC.

                    ON REVIEW FROM COURT OF APPEALS
V.                  CASE NO. 2015-CA-000246
            HARLAN CIRCUIT COURT NO. 14-CI-00542


COMMONWEALTH OF KENTUCKY,                            APPELLEES
CABINET FOR HEALTH AND FAMILY
SERVICES AND COVENTRY HEALTH AND
LIFE INSURANCE D/B/A
COVENTRYCARES, INC.

AND
                    2017-SC-000095-DG


COVENTRY HEALTH AND LIFE                             APPELLANT
INSURANCE

                    ON REVIEW FROM COURT OF APPEALS
V.                  CASE NO. 2015-CA-000246
            HARLAN CIRCUIT COURT NO. 14-CI-00542


LETTIE SEXTON, BY AND THROUGH HER                    APPELLEES
AUTHORIZED REPRESENTATIVE,
APPALACHIAN REGIONAL HEALTHCARE,
INC., AND COMMONWEALTH OF
KENTUCKY, CABINET FOR HEALTH AND
FAMILY SERVICES

## ORDER CORRECTING


The Opinion of the Court rendered September 27, 2018, is corrected on

its face by substitution of the attached Opinion in lieu of the original Opinion.

Said correction does not affect the holding of the original Opinion of the

Court.

ENTERED: September 27, 2018

CHIEF JUSTICE